# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### THOMASVILLE DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| RICKY W. BRACEWELL, | : | |
| | : | |
| Debtor. | : | |
| | : | |
| RICKY W. BRACEWELL, | : | |
| | : | **Bankruptcy Appeal** |
| Appellant, | : | **Civil Action No. 6:04-CV-33 (HL)** |
| | : | |
| v. | : | |
| | : | |
| WALTER W. KELLEY, TRUSTEE, | : | |
| | : | |
| Appellee. | : | |

## <u>ORDER</u>

Before this Court is an appeal from the United States Bankruptcy Court for the Middle District of Georgia brought by Ricky W. Bracewell. The bankruptcy court held that a crop disaster payment, created by federal legislation enacted after Appellant converted his Chapter 12 case to a Chapter 7 case, qualified as property of the estate under 11 U.S.C.A. § 541(a)(1) (West 2004), but not under § 541(a)(6). For the reasons set forth below, the bankruptcy court's decision is reversed in part and affirmed in part.

## I.    JURISDICTION and STANDARD OF REVIEW

Under 28 U.S.C.A. § 158(a)(1), this Court has jurisdiction to hear a final judgment, order, or decree from a United States Bankruptcy Court. 28 U.S.C.A. § 158(a)(1) (West 1993

& Supp. 2004); see Fed. R. Bankr. P. 8001.  The bankruptcy court's order was final within the

meaning of § 158(a)(1); thus, this Court has jurisdiction to hear this appeal.

When adjudicating an appeal from a bankruptcy court, federal district courts are

empowered to "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree" and

will accept the bankruptcy court's factual findings unless those findings are clearly erroneous.

Fed. R. Bankr. P. 8013; see Equitable Life Assurance Soc'y v. Sublett (In re Sublett), 895 F.2d

1381, 1383 (11th Cir. 1990); see also Club Assocs. v. Consol. Capital Realty Investors (In re

Club Assocs.), 951 F.2d 1223, 1228 (11th Cir. 1992).  A district court is not empowered to

make independent findings of fact.  In re Sublett, 895 F.2d at 1384.  Moreover, if a bankruptcy

court's findings are "silent or ambiguous as to an outcome determinative factual question,"

remand to the bankruptcy court is required.  Id. (quoting Wegner v. Grunewaldt, 821 F.2d 1317,

1320 (8th Cir. 1987)).

In contrast to factual findings, conclusions of law, including a bankruptcy court's

interpretation and application of the Bankruptcy Code ("the Code"), are reviewed de novo.  See

Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.), 904 F.2d 588, 593 (11th Cir.

1990).  Whether property constitutes property of the bankruptcy estate is a legal issue to be

reviewed de novo.  Witko v. Menotte (In re Witko), 374 F.3d 1040 (11th Cir. 2004) (citing

Bell-Tel Fed. Credit Union v. Kalter (In re Kalter), 292 F.3d 1350, 1352 (11th Cir. 2002)).

## II.   ISSUES ON APPEAL

This Court must first determine the precise issue being appealed.  Federal Rule of

Bankruptcy Procedure 8006 provides, "[T]he appellant shall file with the clerk and serve on the appellee . . . a statement of the issues to be presented. . . . [I]f the appellee has filed a cross appeal, the appellee as cross appellant shall file and serve a statement of the issues to be presented on the cross appeal." Fed. R. Bankr. P. 8006. "An issue that is not listed pursuant to [Rule 8006] *and* is not inferable from the issues that are listed is deemed waived and will not be considered on appeal." Snap-On Tools, Inc. v. Freeman (In re Freeman), 956 F.2d 252, 255 (11th Cir. 1992) (emphasis added). Thus, as long as an issue is inferable, then Rule 8006 "is not intended to bind either party to the appeal as to the issues that are to be presented." In re Cohoes Indus. Terminal, Inc., 90 B.R. 67, 70 (S.D.N.Y. 1988) (internal quotation marks omitted).

The Eleventh Circuit has not set forth a test for determining when an issue is inferable. Therefore, adopting a mix of approaches from other courts, this Court holds that an issue not listed in a Rule 8006 Issue Statement is inferable under the following circumstances. First, the issue must have been raised in the bankruptcy court because an appellate court generally will not consider issues not adjudicated below. Harrison v. Brent Towing Co., Inc. (In re H & S Transp. Co., Inc.), 110 B.R. 827, 830 (M.D. Tenn. 1990) (citing Singleton v. Wulff, 428 U.S. 106, 121 (1976)). Second, and in conjunction with the previous point, the issue must not require the court to make any independent factual findings. In re H & S Transp. Co., 110 B.R. at 830. Third, the issue must present no surprise to the other litigant. See Turner v. Marshack (In re Turner), 186 B.R. 108, 117 (B.A.P. 9th Cir. 1995).

Here, Appellant identifies the issue as whether a federal crop disaster payment is property of the estate under 11 U.S.C.A. § 541(a)(1).  Appellee, however, contends the issue is whether the payment is property of the estate under § 541(a)(1) and § 541(a)(6).  Appellant argues that the § 541(a)(6) component of the issue is not listed in Appellant's Rule 8006 Issue Statement.  Further, Appellant asserts that Appellee neither filed a cross-appeal on the § 541(a)(6) issue, nor objected to or moved to supplement, to the extent it is possible, Appellant's Rule 8006 Issue Statement.

This Court's review of the record reveals that Appellant is correct regarding both assertions.  However, the Court will consider the § 541(a)(6) issue because the issue is inferable from the filings.  First, the bankruptcy court adjudicated the § 541(a)(6) issue; thus, it is not being raised on appeal for the first time.  Second, the § 541(a)(6) issue does not require this Court to make any independent factual findings.  Third, Appellant was not taken by surprise by the issue.  In fact, Appellee argued the issue in his Response Brief, and Appellee addressed it in his Reply Brief.  Therefore, the issue presented in this appeal is whether Appellant's crop disaster payment is property of Appellant's bankruptcy estate under § 541(a)(1) or § 541(a)(6) when the payment was created by federal legislation after Appellant filed for bankruptcy, specifically after he converted his Chapter 12 bankruptcy case to a Chapter 7 bankruptcy case.

## III.    FACTS and PROCEDURAL HISTORY

The parties stipulated, and the bankruptcy court adopted, the following facts.  Appellant planted approximately 223 acres of seed wheat in November 2000 and approximately 374 acres

of seed cotton in May 2001.  Appellant used regular farming practices to grow the crops to

harvest.  During 2001 Appellant's crops were plagued by drought, causing reduced harvest

yields.  Due to the reduced yields, Appellant was unable to pay for the farm-related debt he

incurred to produce the crops.  Appellant filed a Chapter 12 bankruptcy petition on May 29,

2002, and he converted it to a Chapter 7 case on January 2, 2003.

The Agricultural Assistance Act of 2003 (the "Act") was signed into law on February

20, 2003.  The Act provided assistance to farmers who suffered losses due to weather-related

disasters or other emergency conditions which affected their 2001 or 2002 crops.  The farmers

were allowed to select either the 2001 or 2002 crops as the basis for determining their disaster

payment.  Appellant applied on January 30, 2004 for a disaster payment from the United States

Department of Agriculture Farm Service Agency in the amount of $41,566 for the losses

Appellant incurred on his 2001 crops.

In the proceedings below, Appellee filed a motion to determine whether the crop disaster

payment was property of the Chapter 7 bankruptcy estate.  The bankruptcy court rejected

Appellee's argument that the payment constituted "proceeds" of estate property under 11

U.S.C.A. § 541(a)(6). The bankruptcy court did hold, however, that the payments were property

of the estate under 11 U.S.C.A. § 541(a)(1).  Appellant filed a timely notice of appeal.

IV.    ANALYSIS

In analyzing the issues in this case, the Court shall first focus on property of the estate

under § 541(a)(1) before turning to § 541(a)(6) and whether the decisions reached in this Order

are unfair to creditors.

### A.    Property of the Estate under § 541(a)(1)

Section 541(a)(1) of the Code provides that a debtor's bankruptcy estate is comprised of "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C.A. § 541(a)(1).[1]  Section 541(a)(1)'s broad scope "'includes property of all types, tangible and intangible, as well as causes of actions.'" Meehan v. Wallace (In re Meehan),102 F.3d 1209, 1210 (11th Cir. 1997) (quoting United States v. Whiting Pools, Inc., 462 U.S. 198, 205, n.9 (1983)).  Moreover, "an interest is not outside [§ 541(a)(1)'s] reach because it is novel or contingent."  Segal, 382 U.S. at 379.  Nevertheless, § 541(a)(1)'s wide reach must be balanced by its temporal limitation to the commencement of the case.  In re Vote, 261 B.R. at 442.  Striking the balance between § 541(a)(1)'s wide reach and its temporal limitation lies at the heart of this case.

While neither the Supreme Court nor the Eleventh Circuit have had to strike this balance in the context of federal crop disaster payments, cases addressing this balance do arise in other

---

[1]Although federal law defines what interests of a debtor are transferred to the estate, federal law does not generally address the threshold question of the existence and scope of a debtor's interests.  See In re Witko, 374 F.3d at 1043.  This is because the existence and scope of a debtor's interest are typically defined by state law.  Id.; see Butner v. United States, 440 U.S. 48, 54 (1979).  But state law definitions do not come into play when "some federal interest requires a different result."  Butner, 440 U.S. at 55.  Here, the Appellant's property interest was created by federal law.  Therefore, since the crop disaster payments are a creature of federal law, federal law shall apply.  See Drewes v. Vote (In re Vote), 261 B.R. 439, 441-44 (B.A.P. 8th Cir. 2001) (using federal law to determine the existence and scope of debtor's interest in federally created crop disaster relief payment); Cf. Segal v. Rochelle, 382 U.S. 375, 379 (1966) (using federal law to determine the existence and scope of debtor's interest in a federally created tax refund).

contexts. To illustrate, in <u>Segal</u>, decided under the former Bankruptcy Act, the Supreme Court held that claims for loss-carryback tax refunds were bankruptcy estate property because, in part, they were sufficiently rooted to the debtor's pre-bankruptcy past. 382 U.S. at 380. This was because the predicates for receiving the refunds (payment of taxes in prior years and a net operating loss) occurred pre-petition, even though the <u>Segal</u> debtor could not claim the refunds until the tax year closed. <u>In re Witko</u>, 374 F.3d at 1043 (discussing <u>Segal</u>). Thus, "[t]he debtor had more than a hope that his losses might generate revenue in the future; he 'possessed an existing interest at the time of filing [his bankruptcy petition].'" <u>Id.</u> (interpreting <u>Segal</u>, quoting <u>In re Vote</u>, 276 F.3d at 1026, and citing <u>Sliney v. Battley (In re Schmitz)</u>, 270 F.3d 1254, 1258 (9th Cir. 2001)).

While <u>Segal</u> does not specifically address the issue, it seems as though the tax laws providing for the loss-carryback tax refunds had been enacted prior to the <u>Segal</u> debtor filing his bankruptcy petition. <u>See</u> 26 U.S.C.A. § 172 (West 2002) (listing historical and statutory notes). This assumption underscores the fact that, "[t]he Supreme Court did not allow the <u>Segal</u> trustee to assert more rights than the debtor had at the commencement of the case; it merely allowed the trustee to seek the interests existing, though still undetermined in quantity, at the time the debtor filed his petition." <u>In re Witko</u>, 374 F.3d at 1043 (interpreting <u>Segal</u>). Thus, even though <u>Segal</u> teaches that § 541' s scope is broad, it also teaches that § 541's reach is not without limits. <u>See id.</u> at 1042-43 (interpreting <u>Segal</u>); <u>see also</u> <u>In re Vote</u>, 261 B.R. at 442 (same).

In the context of a legal malpractice claim, the Eleventh Circuit also struck the balance between § 541(a)'s wide reach and its temporal limitation in In re Witko.  374 F.3d at 1043. The In re Witko petitioner filed a petition for voluntary bankruptcy and afterwards claimed that he had suffered harm due to his attorney's alleged malpractice in another proceeding.  Id. at 1042.  Applying Florida law to the malpractice claim, the In re Witko court reasoned that the claim was not bankruptcy estate property.  Id. at 1044.  Instead of finding the claim to be contingent, the In re Witko court found that the claim simply did not exist when the debtor filed for bankruptcy because it had not accrued under Florida law.  Id.  Thus, in In re Witko the Eleventh Circuit seems to instruct that having an interest sufficiently rooted in the pre-bankruptcy past is not enough under Segal to qualify as property of the estate.  Rather, it must be coupled with some sort of "existing interest at the time of filing" to qualify as estate property. Id. at 1043 (internal quotation marks omitted).

Bankruptcy courts have used Segal to find that crop disaster payments, created by legislation enacted pre-petition *and* post-petition, were property of the estate.  Compare Boyett v. Moore (In re Boyett), 250 B.R. 817 (Bankr. S.D. Ga. 2000) (holding that a crop disaster payment created by legislation enacted pre-petition was property of the estate); with Lemos v. Rakozy (In re Lemos), 243 B.R. 96 (Bankr. D. Idaho 1999) (holding that crop disaster payments created by legislation enacted post-petition were property of the estate).  However, these cases do not seem to stand for the proposition that the date the crop disaster legislation was enacted the decisive factor.  Burgess v. Sikes (In re Burgess), 392 F.3d 782, 785 (5th Cir. 2004), reh'g

en banc granted, No. 04-30189, 2005 WL 600279 (5th Cir. March 9, 2005) (interpreting In re Lemos and In re Boyett). Rather, these cases seem to hold that the crop disaster payments were property of the estate because the payments covered crop losses the farmers had incurred before they filed for bankruptcy, making the payments sufficiently rooted to the debtor farmers' pre-bankruptcy pasts. Id. In light of the broad reading the Supreme Court has given to § 541(a)(1), such holdings are a plausible approach – but not the only approach.

For example, the Bankruptcy Appellate Panel for the United States Court of Appeals for the Eighth Circuit determined that crop disaster payments generated under a crop disaster statute enacted after the debtor filed his Chapter 7 petition were not property of the estate under § 541(a)(1). In re Vote, 261 B.R. at 440. First, In re Vote reasoned that Segal and its subsequent line of cases may be questionable authority when dealing with crop disaster payments. Id. at 442. In analyzing the Code's legislative history, In re Vote suggested that Segal's holding may be viable only to the extent that it applies to tax refunds that are received or will be received post-petition. Id. at 443. Indeed, the congressional records for the United States Senate and the House of Representatives state, "'The result of Segal v. Rochelle, . . . is followed, *and the right to a refund is property of the estate*.'" Id. (quoting S. Rep. No. 95-989, at 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R. Rep. No. 95-595, at 367, reprinted in 1978 U.S.C.C.A.N. 5963, 6323) (emphasis).

Citing the same legislative history, however, the Eleventh Circuit emphasized that Segal had continuing vitality for tax refunds in general, not just loss-carryback tax refunds. Doan v.

Hudgins (In re Doan), 672 F.2d 831, 833 (11th Cir. 1982). Indeed, the Eleventh Circuit has

cited Segal with approval outside the tax refund context since the Code came into effect. In re

Witko, 374 F.3d at 1043 (discussing Segal to determine whether a legal malpractice claim was

bankruptcy estate property); Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Alvarez

(In re Alvarez), 224 F.3d 1273, 1289 (11th Cir. 2000) (same). Thus, even though Segal may

be questionable in the Eighth Circuit, it remains an applicable analytical tool in the Eleventh

Circuit.

Nevertheless, even under Segal's approach, In re Vote held that the crop disaster

payments did not fall under § 541(a)(1). 261 B.R. at 444. In re Vote reasoned:

> As of the date the Debtor filed his bankruptcy petition, he may have had,
> at most, an expectation that Congress would enact legislation authorizing crop
> disaster payments to farmers affected by the weather conditions in 1999, but there
> was no assurance that Congress would authorize such payments or that the Debtor
> would qualify for them if they were authorized. It was equally likely that
> Congress would *not* pass such relief legislation. Such an expectancy (or "hope"
> . . . ) does not rise to the level of a "legal or equitable interest" in property of the
> estate under 11 U.S.C. § 541(a)(1).

Id.

The United States Court of Appeals for the Fifth Circuit also addressed Segal in the

context of crop disaster payments in Burgess v. Sikes (In re Burgess), 392 F.3d 782 (5th Cir.

2004), reh'g en banc granted, No. 04-30189, 2005 WL 600279 (5th Cir. March 9, 2005). In In

re Burgess, the legislation providing for the crop disaster payment did not exist at the time the

debtor filed for bankruptcy. Id. at 784. Finding Vote persuasive, Burgess reasoned that at the

time the debtor filed for bankruptcy, he had only a mere hope that future legislation would

provide relief for his crop loss.  Id. at 786.  Although Congress frequently and regularly enacts

such legislation, Burgess noted, the debtor had no way of knowing whether legislation covering

his crop loss would be enacted.  Id.  Thus, the debtor had no legal or equitable right to such a

payment at the commencement of his case absent such legislation.  Id.

An case decided in 1999 that is factually similar to this case, however, reached the

opposite conclusion than the two more recently decided cases that were cited above.  In re

Lemos dealt with whether crop disaster payments were estate property when they were created

by legislation enacted after the debtors filed for Chapter 12 relief and after the debtors converted

their Chapter 12 case to a Chapter 7 case.[2]  243 B.R. at 97-101.  Relying on Segal, In re Lemos

reasoned that the debtor's entitlement to the payments were the result of qualifying events,

growing and suffering certain crop losses, rather than any significant event taking place after

filing his bankruptcy.  Id. at 98.  The Lemos court noted the following:

> Congress frequently and regularly enacts a variety of farm subsidy programs
> . . . which change from year to year.  The prospect of a federal program being
> adopted to compensate for farm losses in any given year may therefore be
> properly characterized as a contingent interest, which, though it may never vest
> if the program does not encompass a particular crop or a particular year, is
> property of the estate when it relates to prepetition crops.

Id.

In re Lemos is not persuasive for several reasons.  First, In re Lemos relied on Battley

---

[2]In re Lemos decided that crop disaster payments qualified as property of the estate under
§ 541(a)(1) and § 541(a)(6).  243 B.R. at 98-101.  The Court addresses In re Lemos' analysis of the
§ 541(a)(1) issue in this section and addresses In re Lemos' analysis of the § 541(a)(6) issue in Section
IV, B of this Order.

-11-

v. Schmitz (In re Schmitz), 224 B.R. 117 (Bankr. D. Alaska 1998), which was later supplemented by the district court, affirmed Bankruptcy Appellate Panel for the Ninth Circuit, but ultimately reversed by the Ninth Circuit, in Sliney v. Battley, (In re Schmitz), 270 F.3d 1254 (9th Cir. 2001). Second, the court's reasoning in In re Lemos' was criticized as being outdated by In re Stallings, 290 B.R. 777, 781 (Bankr. D. Idaho 2003). Bankruptcy Judge Jim D. Pappas, who spoke for the court in In re Lemos, also spoke for the court in In re Stallings. 290 B.R. at 781. Upon reviewing his prior decision in In re Lemos, Judge Pappas determined that the law had changed since In re Lemos had been decided. Id. Consequently, the In re Stallings court held that under 11 U.S.C.A. § 541(a)(1) and § 541 (a)(6), crop disaster payments received from legislation enacted after the filing of a bankruptcy petition were not property of the estate. 290 B.R. at 781-84.

Third, the court's reasoning in In re Lemos improperly conflates two concepts, specifically the contingency of receiving crop disaster payments once authorizing legislation is enacted, and the mere hope that such legislation will be enacted in the first place. The In re Lemos court, in the same sentence, confuses the enactment of federal disaster relief legislation with the factors that would qualify one for such relief. 243 B.R. at 99 ("The prospect of a federal program being adopted to compensate for farm losses . . . may . . . be . . . characterized as a contingent interest, which, though it may never vest if the program does not encompass a particular crop or a particular year, is property of the estate when . . . related to prepetition crops.").

On one hand, the Court agrees that crop disaster relief entitlements are contingent once the authorizing legislation is enacted. This is because once the authorizing legislation is enacted, a farmer not only must meet the congressionally mandated requirements to qualify but also must go through the administrative avenues, although largely ministerial, to obtain the payment. Thus, once crop disaster legislation is enacted, legally significant facts exist upon which a farmer could base a contingent right, which is the same type of contingent right contemplated under <u>Segal</u>.

On the other hand, the mere hope that crop disaster legislation will be enacted to create the contingent interest discussed immediately above is a different concept. Without the crop disaster legislation, growing crops and suffering crop loss – no matter how sufficiently rooted to the pre-bankruptcy past – are of no legal significance and create no right. This is why the bankruptcy court's statement, "Upon the occurrence of the disaster, [Appellant] had the right to collect disaster payments from the government, if such legislation [were] passed,"[3] employs circular reasoning. Indeed, it is the crop disaster legislation that makes growing and suffering certain crop losses relevant by attaching new legal consequences to events completed before the legislation's enactment.[4] Consequently, this is not the type of contingency contemplated by

---

[3]This statement, in the bankruptcy court's brief conclusions of law section, seems to encapsulate the bankruptcy court's reasoning for its § 541(a)(1) holding.

[4]Conflating the concepts of the true contingency of receiving crop disaster payments once authorizing legislation is enacted, and the mere hope that such legislation will be enacted in the first place, also plagues the scant academic discussion of this issue. <u>See generally</u> Tamara D. Wells, Note, <u>The Eighth Circuit Contradicts a Purpose of Bankruptcy by Excluding Crop Loss Disaster Payments from the Bankruptcy Estate in In re Vote</u>, 36 Creighton L. Rev. 315, 341-52 (2003) (improperly arguing

<u>Segal</u> and, moreover, not the type of contingency that is tied to an "existing interest at the time of filing" as is contemplated in <u>In re Witko</u>.

Appellee missed this crucial distinction. For example, Appellee argued that <u>In re Witko</u>'s reasoning can be distinguished from the case under consideration here. Appellee stated that this case involves a crop disaster payment made on account of pre-petition crops, which is not like the malpractice claim in <u>In re Witko</u> that, by law, did not exist until post-petition. Unlike the malpractice claim, Appellee asserted, Appellant's crops did exist before the bankruptcy case was filed, and the crop losses had occurred before the bankruptcy case was filed. Appellee forgot, however, that just as the <u>In re Witko</u> debtor's claim did not exist until post-petition because it had not accrued, Appellant's right to the crop disaster payment did not exist until post-petition because the legislation making his crop loss legally relevant and significant did not exist until post-petition and post-conversion.

Appellee also missed the distinction when he argued that a lottery ticket is analogous to a crop loss and that the subsequent lottery drawing is analogous to the subsequent enactment of the crop disaster legislation. It is true that lottery winnings stemming from a ticket purchased pre-petition, where the drawing was held post-petition, have been held to be estate property. <u>Sirek v. Dalton (In re Dalton)</u>, 146 B.R. 460, 461 (Bankr. D. Az. 1992). But it is not true that crop losses are analogous to such a ticket.

A lottery ticket purchased pre-petition gives the ticket holder an existing contractual right

_____

that crop disaster relief payments are contingent and analogizing such payments to true contingent interests, such as tax refunds).

-14-

Case 6:04-cv-000333tt5   Document 9-17   Filed 09/30/05   Page 15 of 23

to payments should certain contingencies occur.  See, e.g., Brown v. Brown (In re Brown), 82

B.R. 967, 968 (Bankr. N.D. Ind. 1988) ("Lottery winnings are unlike future wages, which are

not property of a Chapter 7 bankruptcy estate, because Debtor has a present contractual right

to receive future lottery payments, whereas he must earn future wages.").  Therefore, while the

lottery ticket memorializes a pre-existing contract that makes subsequent events, for instance

the drawing of certain numbers, relevant and legally significant, it is the crop disaster legislation

that makes growing crops and suffering certain crop losses relevant by attaching new legal

consequences to events completed before the legislation's enactment.  Thus, a better analogy

to a lottery ticket would be the crop disaster relief legislation.  Even this analogy, however, is

imperfect.  The contingent contractual right a lottery ticket affords is premised on events that

might occur in the future; it is prospective.  The contingent right created by the federal crop

disaster legislation at issue here is based on events that have already occurred; it is retrospective.

Thus, it is the post-petition enactment of crop disaster legislation coupled with the retroactive

nature of crop disaster payments that make the payments difficult to categorize and analogize

with other types of property interests.

The Court finds the reasoning of In re Vote and In re Burgess persuasive and finds that

their reasoning is consonant with this circuit's interpretation of Segal.  Therefore, the

bankruptcy court's holding that a crop disaster payment, created by legislation enacted after

Appellant filed for bankruptcy under Chapter 12 and after Appellant converted his case to one

under Chapter 7, is property of the estate under § 541(a)(1) is reversed.

Case 6:04-cv-000337t5   Document 9-1   Filed 03/30/05   Page 16 of 23

## B.    Proceeds of Property of the Estate under § 541(a)(6)

Section 541(a)(6) states that property of the estate includes "proceeds . . . of property of the estate."  11 U.S.C.A § 541(a)(6).  Read together with § 541(a)(1), "proceeds" under § 541(a)(6) must derive from property of the estate, which is a legal or equitable interest of the debtor in property at the commencement of the case.  In re Burgess, 392 F.3d at 787.  Under this reasoning, the In re Burgess court emphasized that the debtor had no legal or equitable interest in property as of the commencement of the case that could mature into the crop disaster payment.  Id.  Consequently, § 541(a)(6), and its reference to proceeds, could not retroactively create a property interest that did not exist at the commencement of the case.  Id.

Here, in a short paragraph, the bankruptcy court held that the crop disaster payment was not proceeds of property of the estate.  This holding seemed to be premised on the assumption that since no crops existed when Appellant filed for bankruptcy, there could be no proceeds.  Appellee, however, urges this Court to hold otherwise.  Appellee argued that several cases dictate a finding that the crop disaster payment should be characterized as proceeds under § 541(a)(6).  First, Appellee cites White v. United States (In re White), No. BRL88-00971C, 1989 WL 146417 (Bankr. N.D. Iowa Oct. 27, 1989), for support.  In re White was a Chapter 12 case in which the disaster payment legislation was enacted two months after the debtor filed his Chapter 12 petition.  Id. at *1.  The In re White court held that one of the two payments the debtor received under the legislation was property of the estate under § 541(a)(6) and that factual issues precluded it from ruling on the other payment.  Id. at *2-7.  Regarding the first

-16-

payment, the court held that the crop disaster payments were "proceeds" of property of the estate by virtue of 11 U.S.C.A. § 1207.  Id. at *4.

> Section 1207 states, in part:

> Property of the estate includes, in addition to the property specified in section 541 of this title . . . all property of the kind specified in such section that the debtor acquires after the commencement of the case *but before the case is closed, dismissed, or converted to a case under chapter 7 of this title*, whichever occurs first."

11 U.S.C.A. § 1207(a)(1) (West 2004) (emphasis added).  Unlike in Chapter 7 cases, in Chapter 12 cases § 1207 can expand property of the estate by including entitlements from crop disaster statutes enacted post-petition.  See id.; see also In re White, No. BRL88-00971C, 1989 WL 146417 at *4.  Thus, it was § 1207 that brought the crop disaster entitlement into the bankruptcy estate as proceeds in In re White.  Here, because Appellant's conversion to Chapter 7 in this case cut off § 1207's applicability, In re White does not offer strong support for Appellee's position.

Second, Appellee cites In re Lemos for support.  The In re Lemos court's reasoning, in holding that crop disaster payments created by legislation enacted after filing a Chapter 12 case and after converting it to a Chapter 7 case are proceeds of property of the estate under § 541(a)(6), is outdated.  In re Stallings, 290 B.R. at 783.  Further, In re Lemos relies on In re White, which, as the above paragraph points out, is properly interpreted as relying heavily on § 1207, and §1207 does not apply in this case because the crop disaster legislation was enacted post-conversion.    Additionally, In re Lemos relies on Kelley v. Ring (In re Ring), 169 B.R.

73 (Bankr. M.D. Ga. 1993) aff'd 160 B.R. 692 (M.D. Ga 1993).  In re Ring, held that a crop

disaster payment created by legislation *prior* to the date the debtor filed for bankruptcy was

"proceeds" of property of the estate under § 541(a)(6).   169 B.R. at 74.   Thus, the court's

holding in In re Ring can be read to support the reasoning set forth in this Order, which focuses

on when the legislation created the entitlement.   Thus, to the extent that an entitlement to crop

disaster payment can be property of the estate when the authorizing legislation is enacted pre-

petition or pre-conversion, then a payment from that entitlement can qualify as proceeds.

Further, In re Ring analogized the crop disaster benefits to insurance payments.   Id. at

76.  This analogy only makes sense if the disaster relief legislation were enacted pre-petition.

This is so because a crop insurance policy on a pre-petition crop would have been issued pre-

petition.  Consequently, the contingent right to enforce the insurance policy in the event of crop

loss would have existed pre-petition and would have constituted property of the estate together

with the crop itself.  Thus, the post-petition payment for a loss covered by the policy is easily

viewed as proceeds of the pre-petition crop by virtue of the pre-petition policy entitlement.

Similarly, the combination of a pre-petition/pre-conversion disaster payment statute and

crop loss would entitle the debtor to receive a crop disaster payment.  This entitlement is a pre-

existing contingent right that is property of the estate even if the payment cannot be applied for

or received until after the debtor files his or her bankruptcy petition, as was the case in In re

Ring.  Thus, the disaster payment, regardless of when it is actually paid, is the proceeds of the

pre-petition entitlement. Without the statute, there would have been no entitlement, and without

the entitlement, there would have been no proceeds. Therefore, because <u>In Re Ring</u> dealt with legislation creating crop disaster relief that was enacted pre-petition, it does not bolster <u>In re Lemos</u> or, consequently, Appellee's argument.

Third, Appellee cites <u>FarmPro Services Inc. v. Brown (In re FarmPro Services, Inc.)</u>, 276 B.R. 620 (D.N.D. 2002), for support. <u>Id.</u> at 622. Although the opinion is not clear on this point, it appears as though this petition was dismissed. Subsequently, the debtors filed a Chapter 13 petition on September 29, 2000. <u>Id.</u> at 623. On October 28, 2000, Congress enacted crop disaster payment legislation providing benefits for the 2000 crop year. <u>Id.</u> The debtors converted their Chapter 13 case to a Chapter 11 case on December 29, 2000. <u>Id.</u> On June 4, 2001, they converted the Chapter 11 case to a Chapter 12 case.

Relying on <u>In re Lemos</u>, the <u>In re FarmPro</u> court found that the crop disaster payments were proceeds of property of the estate under § 541(a)(6). <u>Id.</u> at 624. The debtors argued that <u>In re Lemos</u> did not apply because in that case the right to payments arose pre-petition; whereas, in their case the right to payment arose post-petition. It appears to this Court, however, that the debtors did not read <u>In re Lemos</u> carefully, as in that case, the right to payment arose post-petition. 243 B.R. at 97. In contrast, the right to payment in <u>In re FarmPro</u> arose after the debtors filed their Chapter 13 petition but before they converted to a Chapter 11 case and then to a Chapter 12 case. 276 B.R. at 623. Nevertheless, the <u>In re FarmPro</u> court found the distinction to be irrelevant. <u>Id.</u> at 624. The court reasoned that <u>In re Lemos</u> provided the correct reasoning. <u>Id.</u> To the extent that this Court finds <u>In re Lemos</u>' reasoning unpersuasive as

-19-

discussed earlier in this opinion, it finds <u>In re FarmPro</u>'s reliance on <u>In re Lemos</u> unconvincing.

Even so, <u>In re FarmPro</u> can be read as reaching the correct result for the wrong reasons. The disaster relief legislation at issue in <u>In re FarmPro</u> was enacted after the debtors filed their Chapter 13 petition but before they converted to a Chapter 11 case and then to a Chapter 12 case.  276 B.R.at 623.  Thus, the payments, as proceeds of that right, were received while the debtors were in a Chapter 12 case.  Thus, <u>In re White</u>, – not <u>In re Lemos</u> – is the appropriate authority for <u>In re FarmPro</u>, which failed to recognize that the Code treats Chapter 12 cases and Chapter 7 cases differently.  In light of this interpretation, Appellee's argument as it relates to <u>In re FarmPro</u> is unavailing.

Therefore, the Court affirms the result of the bankruptcy court's holding regarding § 541(a)(6); the crop disaster payment here cannot be characterized as "proceeds" of property of the estate.

### C.   The Possibility of Unfair Results to Creditors

This Court is aware that its legal conclusions may frustrate the efforts of creditors trying to collect on debts owed to them.  For example, Appellee argues that using the enactment date of the crop disaster relief legislation produces absurd results.  Similarly, Appellee and the Bankruptcy Court noted that it would be unfair to allow Appellant to retain the crop disaster payment because Congress could not have intended to give Appellant a windfall to avoid paying the creditors whose extension of credit funded the subject crops.  This Court agrees that a windfall would be unfair.  However, a windfall to debtors will not always occur.

To illustrate, § 1207, as discussed above, may provide some relief to creditors. This is because, unlike in Chapter 7 cases, in Chapter 12 cases § 1207 can expand property of the estate by including entitlements from crop disaster statutes enacted post-petition.  11 U.S.C.A. § 1207(a); see In re White, No. BRL88-00971C, 1989 WL 146417, at *1.  Here, however, Appellant converted his Chapter 12 case to one under Chapter 7 before the legislation creating the crop disaster entitlement was enacted; thus, the provisions of § 1207 do not come into play.

Additionally, Appellee argues that the Court's ruling will encourage manipulation of the Code.  If, however, a court determines that a debtor has abused the bankruptcy process by converting his Chapter 12 case to a Chapter 7 case to keep crop disaster payments from the reach of creditors, § 105 may provide a solution.  Section 105(a) states the following:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11. U.S.C.A. § 105(a) (West 2004).  It would be rather easy to track a bill in Congress dealing with crop disaster relief, and, in an effort to receive a windfall, one could perhaps time a bankruptcy petition or conversion in the hopes that such legislation would be enacted.  Here, however, the bankruptcy court made no findings on whether Appellant converted his case from a Chapter 12 to a Chapter 7 to prevent future crop disaster payments from becoming property of the estate or whether such conduct would amount to bad faith and manipulation of the Code. Further, the Court declines to opine on what possible options § 105(a) would confer on the

-21-

Case 9:04-cv-00033-HL   Document 19   Filed 09/30/05   Page 22 of 23

bankruptcy court should it make such findings.

Another avenue to prevent windfalls could involve creditors attempting to take and perfect security interests in the farmer's future payments from crop disaster entitlement programs. Hon. John K. Pearson, <u>Revised Article 9 and Government Entitlement Program Payments: A Suggested Solution to Classification Confusion</u>, 22-Oct. Am. Bankr. Inst. J. 24, 24 (2003). The revised Article 9 of the Uniform Commercial Code, however, provides little help to a lender attempting to create a security interest in a borrower's government entitlement program. <u>Id.</u> Therefore, lenders are left to untangle the conflicting pre-revision case on the issue and to sort out how the revised Article 9 and the current federal farm legislation fit into that historical framework. <u>Id.</u> Here, the bankruptcy court did not make findings regarding this issue.

Even with the availability to curb potential windfalls, unfairness will be the unfortunate result in some cases. But the unfairness is largely due to the nature of federally created crop disaster payments, which are in the form of congressionally created retrospective relief. Since this relief – and the possibility of a concomitant windfall to debtors – is a creation of Congress, it should be Congress who must remedy the situation, not the courts by judicial fiat. Congress was well aware of what it was creating when it enacted the crop disaster relief legislation. Congress could have crafted the crop disaster legislation in such a way that encompassed the rights of creditors. It did not. Congress could have added a provision to the Code that specifically classified retrospective government entitlements with regard to property of the

estate.  It did not.  Perhaps it should.

## V.    CONCLUSION

The Bankruptcy Court is reversed in part and affirmed in part.  Its holding that the crop

disaster payment in this case was property of the estate under § 541(a)(1) is reversed.  Its

holding that the crop disaster payment in this case was not property of the estate under § 541

(a)(6) is affirmed.


**SO ORDERED**, this the 30th day of March, 2005.



    /s/ Hugh Lawson
**HUGH LAWSON, Judge**

jmb